F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT CO

☆    APR 02 2024

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NY / ISLIP
_____X

MARTIN LEONARD COHEN, pro se,
                 *Plaintiff,*

     -v-

STANLEY H.TEPPER, ALAN R. TEPPER,
WALTER A. KOPROWSKI, as certified
public accountants, and their firm
the CPA Firm of TEPPER, TEPPER,
and KOWPROWSKI, CPAs, PC
                 *Defendants,*

     and

ROBERT SHERMAN, former Business
Officer of Five Towns College, Five Towns
College Real Property Trust, Cohen Family
Limited Partnership, and related entities,
                 *Defendant,*

     and

RUSSELL RICHARDSON, DAVID
PERRY, JOSHUA WAYNE, ALICIA
BROWN in their official capacity
as an IRS Special Agents and other
federal agents,
                 *Nominal Defendants.*
_____X

Index No. **CV 24 2460**

**COMPLAINT**

**BROWN, J.**

**LINDSAY, M.J.**

*Demand for a jury trial.*

## THE PARTIES

1.The plaintiff is Martin L. Cohen. This case involves his personal and business interests in the

companies and entities that his parents helped him set-up as a part of their estate plan. This

includes a 1/3 interest as a Settlor / Beneficiary in the Five Towns College Real Property Trust

(the "Trust"). In addition, he had a 1/3 financial interest in Five Towns College (the "College")
by virtue of his share in the Cohen Family Limited Partnership (the "Partnership").

2. The defendants include Stanley Tepper, CPA, Alan Tepper, CPA, and Walter Koprowski, CPA,
and their firm, Tepper, Tepper, and Kowprowski, CPA, PC (collectively, the "Tepper CPA Firm").
From roughly 1978 until 2015, the Tepper CPA Firm conducted all the certified audits, auditor's
review reports, and tax returns for the College, the Trust, and the Partnership. The Tepper CPA
Firm also prepared the individual tax returns for the plaintiff's parents, Lorraine & Stanley
Cohen, the co-founders of Five Towns College. The Tepper CPA Firm also handled a private
foundation, either the Dix Hills Performing Arts Foundation, or the Five Towns College
Foundation.

3. Robert Sherman was officially the Business Manager of Five Towns College. However, his job
responsibilities included recording and keeping the financial books and records for the College,
the Trust, the Partnership. And related entities including a private foundation. In this capacity, he
was an important conduit for the information received by the Tepper CPA Firm in the preparation
of their audits.

4. Russell Richardson ("Agent Richardson"). Agent Richardson was the IRS Special Agent
assigned to observe the civil trial between father "Stanley Cohen" and "David Cohen" in order to
assess culpability for any potential criminal tax fraud. He was also the IRS Special Agent
investigating a federal False Claims Action filed by Stanley Cohen, the plaintiff's father, and
other IRS Special Agents which include David Perry, Joshua Wayne, and Alicia Brown.

## OTHER NON-PARTIES INVOLVED

5. Stanley Cohen was the plaintiff's recently deceased father, who passed in November 2022. Stanley Cohen was a co-founder and President of Five Towns College, and was originally a Co-Trustee of the Five Towns College Real Property Trust, and the original Managing Partner of the Cohen Family Limited Partnership.

6. Lorraine Cohen was the plaintiff's deceased mother, who passed in 2004. She co-founded Five Towns College with her husband. As co-founders, she and her husband originally owned 100% of the common stock of Five Towns College. She was also an original Co-Trustee of the Five Towns College Real Property Trust, and held an interest in the Cohen Family Limited Partnership. A chart of the family tree is attached. **Exhibit A.**

7. Janet Kaplan Cohen is the plaintiff's younger sister, and also an attorney. She is currently a Co-Trustee / Beneficiary of the Five Towns College Real property Trust, and a Limited Partner in the Cohen Family Limited Partnership. She is currently an officer at Five Towns College.

8. David M. Cohen is the plaintiff's younger brother, and also an attorney. He is currently a Co-Trustee / Beneficiary in the Five Towns College Real Property Trust, and the sole Managing Partner in the Cohen Family Limited Partnership. He is currently the president at Five Towns College.

9. The Middle States Association / Commission on Higher Education is a regional accrediting agency approved by the US Office of Education to assist in the regulation of colleges and universities receiving Title IV Student Financial Aid Funds under the Higher Education Act of '65.

## JURISDICTION

10. The plaintiff, Martin Cohen is a resident of Oyster Bay, LI, NY an area within this judicial district. In addition, all the named defendants either live and / or work in this judicial district. This Complaint also involves a federal issue, that is, the conduct of federal agents based within this judicial district, and the application of the Higher Education Act, as enacted by the US Congress in 1965.

## UNDERSTANDING THE LAW AND REGULATION OF HIGHER EDUCATION

11. This is a civil case against an auditing and accounting firm, the Tepper CPA Firm, and other named defendants. The Tepper CPA Firm was the exclusive and single auditor providing certified financial reports and tax returns for Five Town College, a for-profit college from 1978 until 2015, or roughly 37 years.

12. Auditors get much of their information from the company that they are auditing. In this case, much information was provided to them by Stanley Cohen (now deceased), the founder and college president of Five Towns College from 1972 until 2014, and his Business Officer, Robert Sherman, who is also a defendant.

13. While it is acceptable to receive audit evidence for an audit from the officers of an organization, an auditor must take certain actions to verify the authenticity, appropriateness, accuracy, and completeness of that information.

14. In addition, it is paramount that an auditor remain independent during an audit. An auditor agrees, as a condition of his license, that he will not violate certain laws and rules governing his ability to independently conduct an audit.

15. In the audit of a college that receives federal funds under Title IV of the Higher Education Act of '65 (the "HEA"), a heightened level of auditor due diligence is required. Unlike an ordinary commercial enterprise, such a college becomes the steward of federal funds, and also acts as fiduciary in that respect. An accredited college, as a fiduciary, must act like a fiduciary. The Higher Education Act of '65 (HEA) imposes not only requirements for handling federal funds, but also governs college-wide activities that affect the way a college operates overall in order to insure organizational accountability. This would include the critical role of the college's governing board.

16. While auditors must follow "generally accepted accounting principles" (GAAP), as well as "generally accepted auditing standards" (GAAS), an auditor must also be careful that his client is not in violation of higher education law, especially in areas where GAAP, GAAS, and higher education law overlap in the area of fiscal and administrative responsibility.  An auditor must be aware of federal law and rules governing colleges and universities.

There are four levels of compliance comprising the regulatory process including:

 - federal law, mainly, the HEA and related laws and regulations;

 - state law and regulations involving charter authorizations, degree programs, and minimum requirements involving faculty, library, and other areas;

 - accreditation standards promulgated by approved accreditation associations; and

 - preparation of an audited financial report which is ordinarily disseminated to federal, state, authorities, as well as accrediting associations, and upon which these organizations rely, and coordinate their regulatory activities.

17. The US Office of Education, state education departments, and accrediting associations all rely and depend on the audited financial report which is prepared by the independent auditing firm. Once shared, these regulatory organizations may identify colleges and universities that may have insolvency issues, issues of undercapitalization, excessive debt positions, or any other legal and financial issues of concern to the regulators, such as fraud or embezzlement.

18.  Accounting practices that cover-up fraudulent accounting practices, or failure to identify important violations of internal control by governing boards, or other material misstatements contained in the financial statements of any college or university may result in accountant liability, as well as termination of accreditation to a college, and expulsion from Title IV participation. Thus, compliance with accreditation standards is part of the law of higher education. This Complaint will identify many of these issues at Five Towns College, its related entities, and the critical roles of the Tepper CPA Firm, and Robert Sherman, Business Officer at Five Towns College.

### ESTABLISHED FINDINGS OF SELF-DEALING & MISMANAGEMENT

19. While the law of higher education is well established, it is also clear that Five Towns College operated in an environment that enabled, its president and founder, Stanley Cohen, to act in his own self-interest, and in a manner that facilitated management fraud. The scope of Stanley's various frauds includes frauds upon his own spouse, his son (the plaintiff), and many others including the regulatory agencies. In two separate court judgments, two separate state courts found that Stanley Cohen was guilty of either self-dealing or mismanagement of the College, the Trust, the Partnership, or of all three.

### *Removal as a Trustee of the Trust*

20. In a lawsuit in 2009, the Suffolk County Surrogate's Court found that Stanley Cohen had

improperly indebted the Trust property for over $10 million dollars. Since the Trust was for the

benefit of his children, not the College, the Judge found that Stanley was self-dealing, and

removed him as Trustee, the Alternative Co-Trustees, his children, Martin, Janet , and David

replaced him.[ See *In re: Stanley G. Cohen, as Trustee of the Five Towns College Real Property*

*Trust*, File No. 13 MS 2008A, (Suffolk Co., NY, Surrogates Court, March 11, 2011)].

### *Removal as College President*

21. Later, in 2014, an action for mismanagement of the College was decided by the State

Supreme Court, and Stanley was ousted from the College completely. In each of the two

cases against him, the financial statements which would have disclosed the information relevant

to these wrongdoings was never disclosed. **Exhibit B.** These wrongdoings all involved related

parties, and should have been disclosed by the Tepper CPA Firm.

22. These state court judgments would have a direct bearing on the related entities and persons

involved in those entities. For example:

- mismanagement of the College, in the case of excessive salaries, this would directly effect its

  net income, cash flow, and the balance sheet. So, if Stanley Cohen took excessive salaries from

  the College, then this would reduce net income;

- a reduction in the College's net income would reduce the amount available to the partners of

  the Cohen Family Limited Partnership whose sole source of income is the College;

- a reduction in the amount available to the partners in the Cohen Family Limited Partnership

  would reduce the likelihood that those partners would be able to repay Stanley Cohen for the

amount that he lent to those partners in the acquisition of their limited partnership shares.

- with respect to the Trust property, the original self-amortizing loan was guaranteed by

Stanley's children, Martin, Janet, and David. In return, the College (as a tenant) agreed to pay

the rent to the Trust (as a landlord) which included an amount for the repayment of principle.

The objective was to benefit Stanley's children, so that when the 20-year loan terminated that

there would be a zero balance on the loan. Instead, Stanley prepaid the original loan, and

refinanced with his own loan. The new loan was an interest only loan with a reduced payment

that would not cover the payment of principal. Therefore, the Trust which was intended to

benefit the children, instead, benefited the College. Thus, this enabled Stanley to take

excessive salaries which were never approved by the College Board of Trustees.

- with respect to the Trust property, the Trust Agreement required any new construction, such

as the construction of the dormitories to have the title vested in the name of the Trust. Instead,

the audited financial statements show the ownership to the College.

- with respect to the Trust income, the Trust Agreement provides for the distribution of any trust

income to the beneficiaries, instead, Stanley took all the income, as a management fee.

- with respect to the private foundations, Stanley also took the opportunity to cheat the IRS.

Despite the existence of extensive public litigation, and the suspicious amount of related party

transactions, such events were never disclosed by the Tepper CPA Firm in any of their audit

reports.

## A FRAUD UPON THE PLAINTIFF

23. Martin L. Cohen, is an intended beneficiary of his parents estate plan in which he was supposed to have an equal share in a $30+ million estate plan with his two siblings Janet and David.

24. After the plaintiff's mother, Lorraine, became terminally ill, his father, Stanley, decided to improperly and unlawfully change the estate plan documents since he started dating other women and wanted to remarry. Knowing that the plaintiff would be displeased with his decisions to change the estate plan, and the fact that Stanley wanted to shift blame for his own previous misdeeds, the plaintiff's father provided false testimony in order to file a federal False Claims Action (the "FCA") against the plaintiff, under the theory that the best defense is a strong offense.

25. Although, the FCA is a confidential document and is kept "under-seal", soon after filing the FCA, Stanley went to a campaign to extort Martin from ever being able to defend himself. Stanley did this by dramatically lowering his salary at the College. Moreover, Stanley never distributed any Trust benefits to Martin, and because Stanley continued to reduce his salary at the College, Stanley caused Martin to default on the notes of the Partnership, effectively confiscating his equitable interest in the Partnership. Eventually, this also led to Martin losing his home, and his wife divorced him, as a result of Stanley's cruel and inhuman treatment toward's Martin. Martin could have minimized his damages by his father, if the Tepper CPA Firm properly disclosed the related party transactions.

26.The fraudulently filed federal FCA brought IRS Special Agent Richardson, and the other federal agents into the situation, and Agent Richardson made the plaintiff a target in a criminal

tax fraud investigation based on tax law despite the lack of any probable cause. However, Agent Richardson failed to recognize and understand that the Higher Education Act of 1965 was the controlling law, not the tax law. In this case, higher education law pre-empts tax law. The tax law would apply, but only after a proper assessment of legal responsibility and attribution of losses under the Higher Education Act of '65. Agent Richardson erred in following a decision in state court which did not have the proper legal jurisdiction to decide certain federal issues. Agent Richardson completely ignored the Act of '65 which was major legislation affecting the operation of American colleges and universities, and governed the operation of the College. Before any tax liabilities could be assessed, there would first need to be an assessment of the wrongdoings by Stanley. Stanley engaged in unbridled management frauds upon many, even including the regulators. Stanley cannot embezzle and steal from others, and then claim that the others are guilty of tax fraud, as a means to prevent them from accusing him of violating of higher education laws, especially if Stanley's claims are fraudulent.

27. Nonetheless, Agent Richardson and other federal agents proceeded completely ignorant of the laws involving colleges and universities with an intent to destroy the plaintiff. Instead, they embarked on a 24/7 surveillance campaign of Martin's personal life. This enabled them to spread false and derogatory information about Martin. In addition, they interfered with his divorce proceedings, and Martin's otherwise good relationships with employers. In essence, Agent Richardson, with the protection of federal immunity continued a rampage of the same level of tax extortion upon Martin's life that Stanley used to torture and extort Martin with similar threats.

## Higher Education Law Pre-empts Tax Law

28. It must be pointed out that a charge of tax fraud is a secondary charge. There must first be an established fraud. Once the fraud is proven, then criminal or civil liability can be assessed, and a trial for tax fraud may be commenced.

29. The enactment of the Higher Education Act of 1965 by the United States Congress put into place a unique and complex regulatory scheme which shifted major responsibility for state education departments and accreditation associations for the supervision and regulation of colleges and universities. Such regulation has legal significance in the assessment of civil and criminal liabilities among senior administrators. It also is designed to insure fiscal and administrative controls related to the governing board.

30. Although the US Dept. of Education plays a central role, the HEA had effectively decentralized the regulation of higher education. This shift came about with the increased role of regional accrediting associations. Litigation involving the regional accrediting associations effectively created a body of federal common law in higher education. Over time, the body of common law re-shaped the governance of colleges and universities, including the responsibilities of governing boards of all colleges and universities. Together with state departments of education, and recognized accreditation associations, the US Office of Education promulgated additional rules and regulations that carried the force of federal law in a highly coordinated effort.

31. Instead of recognizing the sophisticated regulatory design enacted by the US Congress, Agent Richardson relied on the false statements of Stanley Cohen, who himself was a serial tax offender. Stanley was really attempting to shift the blame for his various frauds to the plaintiff.

Under the laws involving the FCA, the initial FCA complaint and ensuing activity is considered "under-seal", and not subject to public disclosure. As a result, Agent Richardson has secretly targeted the plaintiff for many years. Consequently, Agent Richardson has caused the destruction of the plaintiff's career, family, and financial resources. Between the concerted efforts of the his Father's accountants, the Tepper CPA Firm and the College's Business Officer, Robert Sherman, the plaintiff was defrauded of his entire inheritance, and all his other personal financial resources. This lawsuit has been commenced by the plaintiff for the damages he has suffered as result of intentionally misleading financial statements created by the Tepper CPA Firm, and Robert Sherman.

## A RETROSPECTIVE VIEW: STANLEY WANTS TO START A COLLEGE

32. The history of the plaintiff's family is important because it is within this context that he grew up, and helped develop the proper values needed in a democratic society. His father who eventually earned his doctorate in music education, gave him music instrument lessons since he was young enough to sit at the piano. His mother, a licensed business educator, gave him the inspiration to study accounting and pursue his BA and MBA in accounting. His maternal grandfather, Leo Kleinman, who was close with many state court judges, gave him the inspiration to study law.

33. The plaintiff's parents earned a very modest working class lifestyle during most of their lives. They kept and maintained each of their cars for ten years or more in order to save the family

money. They lived in modest homes growing up. The plaintiff''s household was based on the income of two public school educators. They were not rich. They were a working class family.

34. The plaintiff is now 69 years old, however, as a young child corporal punishment was still accepted, and although his father was not evil, he did have a dark side. He was a strict disciplinarian, and the plaintiff still remember him taking his belt off when his father thought that the plaintiff had misbehaved.

35. Although, times were starting to change for women, his father kept his mother in a submissive position, especially when it came to  things that were important to his father.

36.Then, in about 1972, the plaintiff's father learned of an opportunity to start a for-profit college. Initially, his father didn't have the financial resources required by New York State at the time, but his mother agreed to ask his grandfather, Leo, for help, and Leo agreed. However, the only condition other than repayment of the $50,000 loan at the time was that his mother, Lorraine, would receive a 50% interest in the voting stock of the new college. His father agreed to the terms of the loan.

## THE FORMATION OF FIVE TOWNS COLLEGE

*Absolute power corrupts.....absolutely!*

37. The day that the plaintiff's family learned that Five Towns College was approved was an, otherwise, ordinary day. While the plaintiff was sitting with his parents in their home in North Woodmere in Nassau County, LI, a cylindrical tube arrived in the mail. The  plaintiff's mother and father were excited since they could see on the outside of the tube that the sender was the New York State Board of Regents. This is the state agency that authorizes new colleges. When

the plaintiff's father opened the package, he unravelled a Provisional Charter for Five Towns College. The plaintiff's family all rejoiced and celebrated the new business opportunity. The plaintiff's father didn't change his behavior overnight, but over the next 18 months when the College opened for its first class, it was clear that Stanley was no longer the mild-mannered public school music teacher that we all adored so much. His "dark-side" (as Stanley described himself) was about to emerge.

38. To the plaintiff's astonishment, his father ultimately betrayed his mother and his grandfather, Leo Kleinman. Instead of giving his mother an equal 50% share of the College's voting stock, his father gave her only 49.3%, while Stanley retained 50.7, thereby reducing his mother into a minority interest position. The plaintiff was present and a witness to these events. The plaintiff was also present when his father negotiated the loan with his grandfather, so the plaintiff was shocked by the betrayal. Since his mother was controlled and dominated by his father, even though she argued and protested, she ultimately found it hard to fight back. However, that incident made the plaintiff realize that his father's personality was changing, and that another side of his personality was emerging…his father realized this himself, and he would eventually call it his "dark side." His father would often threaten and intimidate others, warning them of his "dark side."

*The College Begins Operations*

39. From the first day that the College began operations in September 1973, the plaintiff's father's demeanor changed. From a mild-mannered music educator, he turned into a closed-minded bureaucrat whose sole mission was to see the College succeed. No one could blame him for this. However, as time went on, he evolved into a Machiavellian-style autocrat. His

oppression of family members dramatically increased. Family members were routinely ordered to carry-out his commands without any discussion or comment. The wasn't so bad at first, however, over time, his father only got worse.

40. Now that Martin was helping his father, the plaintiff enrolled in several graduate and doctoral programs in higher education. His father had no experience, as a college president, and his father had even less background running a for-profit corporation. Many of his father's decisions were out of ignorance, and were based strictly on raw power.

41. Early on in 1975, his father started seeking accreditation from the Middle States Association / Commission on Higher Education (the "MSA). However, his father constantly mishandled the relationship with MSA. His father's tactic was to use power, in a system that instead placed a high value on collegiality. The result was poor relations with the accreditation association officials. For years, his father was at loggerheads with MSA officials, and the College was denied membership on several occasions.

42. His father's abuse of power spread and continued throughout much of his professional life. Besides his family and MSA, his relationship with the faculty and students became very poor. In about 1990, there was a full-blown college-wide student protest that caught the attention of Newsday, the regional daily newspaper. Eventually, his father realized that he needed competent administrators and needed less personal interaction with the students and faculty. This made Stanley even more isolated. However, with the assistance of a new college dean, William Nosofsky, the College gained accreditation and joined MSA, and the administrative environment improved.

*The Five Towns College Board of Trustees (the governing board)*

43. The Five Towns College Board of Trustees are empowered by the College Charter, and by the operational standards set by MSA. With respect to Stanley Cohen's relationship in his capacity as College President with members of the College Board of Trustees, this is set by MSA Standard # 4 " Leadership and Governance" and MSA Standard #5,  "Administration".  **Exhibit C**. The Board of Trustees of any college accredited by the MSA requires the governing board to be independent. Moreover, they are to be self-perpetuating (meaning that they themselves, as Board members, select the new members). In accordance with MSA mandates, they carried defined terms of office. However, Stanley, instead, always invited his friends, family members, and colleagues with which he already had trusting personal relationships. This created a clear conflict of interest since it is the governing board that is supposed to negotiate the college president's salary and term of office. However, Stanley ignored those rules and this was a continued source of contention for MSA.

*Usurping the power of the Board of Trustees*

44. Stanley constantly demanded that the Board "rubber-stamp" his proposals, and always sought to ignore or override their decisions. Whenever there would be an important controversy, he would use threats of removal and stockholder retaliation (since he was also the majority stockholder) to get his way. The plaintiff's mother asked her cousin, Sue Luskin, an attorney, to serve on the Board in order to monitor his mother's interests. However, his father was a very difficult man, and Sue realized that it was better not to make any waves. Any problems, she could report independently to the plaintiff's mother, but she was powerless to do anything.

45. Not surprisingly, the power of the College Board of Trustees was also rendered impotent. They only met twice a year. In addition, they never had their own budget, so they lacked the financial resources to be truly independent. They also never had a bona fide secretary with a separate office.

46. Once Board minutes were completed, and the Board members left the College campus, the plaintiff's father would then begin to change and alter the Board's minutes, so that they would appear to approve Stanley's decisions, not the Boards. Then, Stanley would have his own typist prepare the final copy. Once completed, he would mail copies out to the Board members. Since the Board only met every six months, memories faded, and Stanley always succeeded in getting his way. The Board was kept in the dark on too many issues. This was a flagrant violation of MSA standards, and ultimately a complete violation of the College's financial and administrative internal controls.

47. Thus, the financial oversight of the College by the Board of Trustees was virtually non-existent, and contrary to law and regulation. **It is important to recognize that the preparation of certified financial reports were required annually once the College became accredited, as a matter of law.** The certified auditor's report is the lynchpin to the coordination of the federal regulatory scheme enacted by the US Congress. The certified auditor's report is shared by state and federal agencies, as well as the accrediting associations.

48. In addition, neither the Chair of the College Board of Trustees, nor any of the Board members had any involvement in the preparation of the financial statements. This was a major violation of internal control, crossing deeply into the realm of fraudulent behavior, but which was never disclosed to anyone. There was only one person who was aware of this dangerous

condition, Stanley Tepper, CPA of the Tepper CPA Firm. Robert Sherman may have known, but he was not present at many Board of Trustee meetings, and Robert Sherman never informed the Board of Stanley's misconduct.

49. In fact, the Board of Trustees never even hired the auditing firm, even though that was one of their primary and important responsibilities. They never even met the auditor, Mr. Tepper, or any members of his firm. Despite this, Mr. Tepper would complete his audit and the heading of the report would be addressed to the Board of Trustees. Upon completion, Mr. Tepper would ordinarily deliver the audit report directly to Stanley, not to the Board members, as required. Then Stanley would review the report himself to see that it was acceptable to him, and exclude disclosures that were unacceptable to him. Even though the American Institute of CPA's requires specific disclosures, the Tepper CPA Firm allowed Stanley to decide the disclosures himself. The result was that the certified audit reports included false and misleading information. The Tepper CPA Firm was more interested in the lucrative audit fees they collected over the years, then the accuracy and completeness of the certified audit report. The Tepper CPA Firm collected several millions of dollars in return.

*Committing management fraud*

50. An auditor's report which leads to inaccurate information or incomplete disclosures facilitates and contributes to "management fraud.". In any corporation, there must be a segregation of duties. Shareholders retain an economic interest in the corporation, but delegate

management responsibility to the governing board. In turn, the governing board decides on

selecting and retaining management, including the retention of the chief executive, and other

senior officials. Internal controls are necessary to prevent fraud.

51. From a legal standpoint, the auditing firm ought to have been hired by either the Chair of the

Board of Trustees, or the Chair of the Finance Sub-Committee. Instead, the auditing firm was

hired by the College President, Stanley Cohen. By so doing, he created an inherent and serious

conflict of interest. Stanley Cohen tried to cover-up the conflict by appointing himself a Trustee.

However, by virtue of the rules of accreditation, he should have been prohibited from voting on

legal issues before the governing board. However, Stanley dominated the Board, and showed his

discontent with those that would disagree with him by phasing them off the Board. Thus,

multiple management frauds ensued. Among many other things, Stanley took unauthorized

bonuses. He also created unlimited personal expense accounts for himself for dining and travel

which were never approved by the Board, and Stanley even rented a small apartment where he

could date other women, but these were minor compared to other defalcations.

52. Stanley only made one copy of the certified audit report which would often be available to

the members of the Board of Trustees for the first 15 minutes of their meetings. That is even, if

they were interested in even seeing it. For Board members with financial and legal backgrounds,

the lack of any significant disclosures was often a red-flag to those members. Moreover, the

plaintiff's father did not like having more than one financial or legal professional on the Board

for this very reason. Nearly all of the business professionals that ever did join the governing

would eventually resign over the mishandling of the legal procedures governing board decision

making, and lack of any transparency in the financial statements. Most of the Board members

were untrained and unqualified. Most were public school teachers, who had no idea of their true responsibilities. Stanley acted with the unbridled intention to take whatever he wanted, and whenever he wanted it. He was virtually unaccountable to anyone. This was a problem for the College.

53. There are certain things that the plaintiff's father would never disclose even to the Board of Trustees, including his salary, or fringe benefits. The plaintiff had huge arguments with his father when his father tried to have the College pay for the expenses connected with his father's Florida residence which was strictly a vacation residence.

54. At non-profit colleges, the governing board may provide a residence on campus for the college president. There are two reasons for this. The first is that the employment contract between the college president and the board may only be for a short period of time, and it would be unfair to make a new president sell his residence for a short-term employment contract. The second reason is that the governing board needs a strong administrative presence on campus at all times, especially where there are a large percentage of residential students. Obviously, this was not the case at Five Towns College. First of all, the purchase of the home was not because his father had a short-term employment contract…he was the owner of the college… and this wasn't a middle class modest home. It was a very expensive, 5 bedroom, luxury California Contemporary on over an acre with a 3-car garage (with cars also purchased by the college, and a heated swimming pool). Perhaps, it might have been appropriate for the College president at New York University with 25,000 students, but Five Towns College at the time of purchase had only 700 students. Secondly, the plaintiff's father bought a home several miles away from the the college campus and he wasn't available to provide management oversight. Obviously, this

was never made known to the Board, nor was it disclosed in the College's audited financial statements. It is an example of issues requiring the Board's approval, but were never brought to the governing boards attention.

### *Five Towns College Continues To Grow*

55. A number of improvements and new programs had been initiated at the College by the plaintiff due to his dedication, hard work, and initiative. For example, Stanley created the music performance programs, but the plaintiff embellished upon his father's ideas and expanded the business division in order to add a program in Music Business which was an immediate success, and almost instantly doubled the College student enrollment. Eventually, the enrollment in Music Business would exceed the enrollment in the Music Performance programs. The plaintiff believed that he was part of a family team. However, he also felt that at times that his father instead was competing with him. The plaintiff believed his father was even jealous of him because he was young and successful. Eventually, jealousy turns to hate…that became obvious over time.

### *Martin continued to spearhead the College's growth*

56. In 1981, Martin attended the doctoral program in higher education evenings at New York University, and brought a new and profitable vision to the College. Unfortunately, his father didn't fully understand, but he still allowed Martin because Martin helped the College grow and succeed.

57. Stanley had for many years attempted to gain approval from the State Board of Regents for its first baccalaureate degree. However, throughout the 1980's, Stanley's reputation and

relationship with Dr. Donald Nolan, the Assistant Commissioner for the State Education Dept. had also soured. Known for his autocratic style of management and being a bully, Stanley was not liked by many in the regulatory circles of higher education, especially with MSA, who found him to have a "combative style" in his dealings with others.

58. Martin was married in 1984, and left the College to attend law school from 1983 until 1987. His departure from the College enabled him to devote more time to the study of higher education law, and he engaged in independent research which led to a research paper on the "Law of Accreditation in Higher Education." During this period he also developed good relationships with members of the state legislature, including agency officials in the Office of Higher Education Evaluation of the State Education Dept.

59. After law school, Martin worked for KPMG, the global accounting and consulting firm which specialized in higher education. These experiences and training at the highest levels enabled him to become a skilled and knowledgable higher education professional. This was something that Five Towns College had lacked previously. By 1990, Martin had a newborn daughter, Lindsey, and he decided to return to work at the College. Then, in 1992, Martin created the John Lennon Center for Music & Technology at Five Towns College. This included the College's first professional audio and video recording facilities. It enabled all of the College's programs to flourish, and grow dramatically, but his father's disdain for Martin continued to grow.

## III. THE COHEN FAMILY ESTATE PLAN

### *About the Formation of the Five Towns College Real Property Trust*

60. Five Towns College originally opened its door in 1973 with 92 students, and only offered two-year programs. By 1991, the College had over 600 students, and was the first four-year college in New York State with Jazz / Commercial Music as its major mission, so the college needed a new campus for expansion. At nearly 40 years old, and with nearly 20 years of experience operating the College, the plaintiff undertook the search for a new campus. Eventually, he found the property which now houses the College in Dix Hills, Long Island.

61. The new campus was 34 acres with 125,000 square feet. The College would need to continue its path of rapid growth of 15%, if was to support this new facility. The previous facility was on roughly eight acres, and had only 40,000 square feet. So, in order to insure the financial success of the College, the plaintiff proposed a plan to convert the remaining two-year business programs into a four-year program leading to the Bachelor of Professional Studies degree. Based on the plaintiff's good relationship with regulators, the proposal was approved. This enabled the College to enroll over 700 students, and eventually exceeded 1,000 students.

62. The new campus was located in a community without adequate access to public transportation. So, the plaintiff negotiated with the Suffolk County Dept. of Transportation to have the S-54 bus route which began its route at the LI Railroad Station in Babylon to the doorsteps to the entryway at Five Towns College. From then on, Martin could see 100 additional students gain access to the College daily. These were students, who previously could not gain access because they didn't have car. Martin, eventually became an expert in student marketing by

creating such initiatives. By this time, his father and mother were spending more time in their newly acquired vacation home in Florida.

63. As part of the planning process in acquiring the new campus, both Lorraine and Stanley realized that they were well over 60 years of age, and had no adequate estate plan. Moreover, the plaintiff had worked for many years for the College since 1975. He had accepted a low salary in the early years (Exhibit A), based on the promise that once the College became successful that he would get a substantial raise. By 1992, he was almost 40 years old, married, and had a child and his own family's future to think of. Moreover, Martin had no medical insurance, pension plan, or any other fringe benefits.

64. It was clear at the time, that Stanley, would never willingly relinquish control of the College to his children, so this created an estate planning problem. The overwhelming majority of his parents estate was completely tied up in the College's common stock. If his parents died prematurely in an accident, then the College would be burdened with estate taxes. Federal and state estate taxes in 1992 were over 50%, so in the event of a premature passing of his parents in an accident would cause a huge tax liability, and possibly the need to dissolve the business in order to pay estate taxes. This was a clear threat to the College's survival. Moreover, Stanley did not believe in life insurance which could be used to fund estate taxes. So another estate plan opportunity had to be found.

65. At the time the IRS also frowned upon family limited partnerships because many were considered abusive, and merely a tax-avoidance vehicles. However, the use of irrevocable inter vivos trusts was still a valid manner of transferring wealth between family members. However, there was even a greater reason to consider the use of a trust.

66. From the time that had reached puberty, and was old enough to know about the "birds-and-the bees", he knew that his father was not completely faithful to my mother. Even when Stanley was a public school teacher, he would take music gigs on the weekend. These jobs required him to be away from the family. His bandleader, then Les Wagman, was a serial wife-cheater, and would take Stanley with him to prostitutes after the gig was over. Martin knew this was the case because, Martin used to share usage of the family automobile with his father. Then, one day, Martin found a listing of call girls from a pornographic magazine under the seat of the drivers side of the car. From then on, Martin would keep an eye out for his father. Martin did not want Stanley to hurt his mother. Martin wanted his family to stay together. Additionally, a divorce could destroy the College financially.

67. For many years after that incident, Martin had no occasion to suspect that his father was continuing his indiscretions. By the late 1980's, he was already in his late 50's, and he had seemed to settle down…so Martin thought. However, it turned out that Martin was wrong. On one occasion, the plaintiff had attended a professional conference concerning college accreditation with Stanley in Baltimore, Maryland.

68. It was there that Martin saw his father trying to seduce other women, and he was nearly successful had Martin not intervened. Stanley seemed to be proud that he was still able to engage in that sort of behavior. Martin just prayed that this might have been a one time incident. However, a few months later Stanley told Martin about other affairs. Martin was deeply worried for his mother, who still loved Stanley very much. However, Martin extremely worried that in

the event of a divorce that the College could be destroyed and tied up in litigation. He had too much of a personal investment in the success and longevity of the College.

69. Although, Martin knew a lot about income taxes issues for middle class persons, he had absolutely no experience with federal estate taxes. He only knew, as a layperson, what was being written at the time in the newspapers and trade journals. Otherwise, he felt the need to consult with an attorney, who specialized in estate planning. Martin discussed the need for an estate planning attorney with his parents, and they agreed that a specialist was necessary.

70. Estate planning attorneys are expensive. Moreover, Martin's salary from Five Towns College in 1991 was very low. So, Martin asked his parents permission to find a specialist that would represent the entire family and in which his parents would pay the cost. They agreed. After a rigorous search, Martin found the law firm of Shanker & Hochberg which was nearby in Huntington Village, LI, NY. Martin did all the initial screening and initial interviewing of Marc Hochberg. Although, estate planning was not his expertise, his initial discussions and interview with Mr. Hochberg and his staff convinced Martin that Marc Hochberg was highly competent, and Hochberg agreed to represent the family. The collective representation was an important feature because any estate plan would necessarily include his siblings, Janet and David, who also could not afford their own costly attorney. So, the agreement to represent the entire nuclear family of Stanley & Loraine Cohen was a condition of the retainer, and Martin's parents, and siblings all seemed to be happy with that arrangement.

71. Once Mr. Hochberg was retained, the most difficult task would be moving the entire College from Seaford, LI to Dix Hills, LI. The library, classroom chairs and desks, specialized laboratories, typing and computer classrooms, and even the audio recording studio had to be moved. Martin hired Verity Moving Company for the heavy equipment and furniture, then he led the remainder of the move. He hired two dozen students and rented a U-Haul and throughout the summer of 1992 with everyone's help, they moved the contents of the entire College.

72. In addition, the new campus was in an abandoned building that had previously been neglected, so Martin hired another dozen students and faculty to mop the floors, clean windows, and prepare the new campus for the move in. The  entire move needed to be accomplished between June and August in 1992.

### *The Legal Arrangement Between the College and the Trust*

73. In accordance with the family's estate planning goals, the family set up the Trust. At the time, a tax incentive was set up by the Suffolk County Industrial Development Agency (SCIDA) to offer real estate tax abatements. This was accomplished by allowing the SCIDA to take nominal title to the property, and then over a seven-year period, real estate taxes would be increased to the full taxable assessment.

74. Ordinarily, if the Trust entered into a lease with the College directly, there would be a landlord tenant relationship. However, since the SCIDA took nominal title. Thus, the legal documents refer to the Trust as the sub-lessor (or landlord) , and the College as the sub-lessee (or tenant). At the closing ceremony, when the Trust took possession of the property, the lease between the Trust

and the College was documented as the Sublease Agreement. This was a 20 year lease agreement.

### *How the new campus property was funded by the Trust...*

75. Since Five Towns College was a for-profit college, it was only natural that the children would expect to inherit the College upon the passing of their parents. The College commenced operations in 1973, and even then Stanley started to begin saving some of the profits from the College in the expectation that one day, the College would want to own its own property, and not need to rent a building.

76. In about 1980, Stanley Tepper, CPA suggested that Stanley set up a separate company that could siphon profits from the College. This was intended to accomplish two goals. First was to reduce the income taxes on the family by spreading the income which would include the children who were at a low tax bracket. The second goal was to accumulate funds for the acquisition of a new campus that the family would own, and no longer need to rent. Based on the advice of the Tepper CPA Firm, my father formed Arista Management, Ltd. (a/k/a "AML"), and filed as an S-Corporation (i.e., taxed as a family partnership).

77. Although, Stanley made all the children additional stockholders in AML, there were additional income taxes on each child's income. As money came out of the AML bank account, the funds were placed in joint investment accounts for each child by Stanley for their benefit. However, he did not pay the additional income taxes on the distribution. The children paid the

taxes. Unfortunately, this became a financial burden for the plaintiff, so he eventually forfeited his shares in AML.

78. The AML tax scheme described above was only one, but there were several others. One of the most pervasive was the Notes Payable mess that Stanley created on the books of the College. In this scheme, he would have the College issue notes to members of his family. The sums varied, but ordinarily in denominations of $25,000, more or less. There was no legal basis for creating the notes, but the intent was only to solidify his control over family members. At various points in time, the Notes Payable accounts used exclusively for this purpose, exceeded $200,000-$300,000. It was a way for him to seemingly reward family members, or punish them as he pleased without having to give away any money. The Five Towns College Board of Trustees was unaware of these transactions since they were not disclosed as "related party" transactions as part of the independent audit report conducted by the Tepper CPA Firm. From an IRS position, any receipt of property without consideration is taxable income. However, the Tepper CPA Firm never sent out IRS 1099 Forms to the recipients of the notes.

79. Eventually, Stanley created a complete mess out of the situation, and lost control of what ever he thought he was doing. Once, Martin criticized him for what he was doing, Stanley shifted the handling of the notes to Robert Sherman. It got so bad that Stanley had to recall all the notes, and retrieve them back from family members without any payments. Ordinarily, when a debt is cancelled, it is considered "forgiveness" of a debt, and the transaction creates a taxable event. However, the Tepper CPA Firm completely ignored the entire debacle, and the College Board of Trustees was never made aware of the wild scheme. It is clear that Stanley created an undeniable pattern of fraudulent and corrupt behavior. Again, this bad behavior could have been stopped, if

it was properly accounted for. Both Robert Sherman and the Tepper CPA Firm violated their duties of trust.

80. By 1992, when it came to acquiring the new campus, Martin explained to his father that the funds accumulated in the three investment accounts needed to be deposited into the bank accounts for the Trust since the money came from the children, and as agreed, were to be used for the acquisition of the new campus. However, Stanley reneged on his promise. Stanley then told Martin that this was Stanley's money, not the children's, and that he was going to convert the College to a non-profit entity. This sudden change was a shock to Martin. Consequently, Stanley refused to deposit the money in the Trust's bank accounts. Instead, Stanley deposited the $990,000 into the College's general account. However, the Tepper CPA Firm never properly disclosed this large deposit, and never reported it on the College's audited financial statements. He allowed it to be mixed together with the Tuition accounts, as if it never existed.

### Accounting for the Trust

81. The family unanimously agreed upon the formation of an irrevocable inter vivos trust, as the best way to protect the family. The general plan was to make all real property acquisitions in the name of the Trust. This would insulate those assets from any liability arising from litigation involving students attending the College. It would also maximize control of those assets by the family in the event the College converted to a non-profit entity. This was similar to the NY Institute of Technology (NYIT) situation arranged by the Shure family that ran NYIT.

82. The lease between the Trust, as landlord, and the College, as the tenant was set with a 20-year term beginning in 1992. The financial arrangement was set-up so that initially a small

amount of rent would be collected from the College in order to pay the monthly mortgage, real estate taxes and other operational expenses.

83. A 20-year self-amortizing mortgage was arranged, and agreed to by all. The 20 year term, maturing in the year 2020, was chosen because then the plaintiff would be almost 60 years old and ready to retire. Accordingly, his siblings could also decide to retire then, too, if they wanted. Since the loan amount was roughly $2,400,000, and monthly payments included interest and principal, then by 2012, the entire loan would have been paid off.

84. Although dormitories weren't a consideration in 1992 when the Trust took title to the property, the lease agreement between the College and the Trust for the recognition of any property built on the leased land by the College to be subsequently owned by the Trust. The sub-lease clearly states, "Title to all such additions, alterations, substitutions, and replacements shall immediately vest in the Sublessor (the "Trust"), and all thereof shall be part of the Subleased Premises. [Sublease Agreement, Under Alterations, Paragraph 12 , Sec. (a)]. However, neither Robert Sherman, nor the Tepper CPA Firm handled the accounting treatment this way, as required by the source documents.

85. Furthermore, the Sublease agreement states that the "Sublessee (the "College") may, at its expense: (i) construct upon the the subleased premises any additional buildings, structures, or other improvements, and (ii) install, assemble, or place upon the subleased premises any items of machinery or equipment used  or useful in Sublessee's business, in each case upon compliance with paragraph 12(a). Under "Alterations", Par. 12, Sec.(b). Therefore, it does not matter whether the College paid for the dormitories, or not. The parties agreed that ownership would vest in the Trust.

86. The Trust agreement also called for the distribution of any net income every year to the Trust beneficiaries.

## X. FRAUD ON THE MIDDLE STATES ASSOCIATION

87. The fraud on the MSA was committed in connection with an evaluation team visitation in 2007. There were two components to the fraud. One was the management frauds committed by Stanley Cohen which, if disclosed by the Tepper CPA Firm or Robert Sherman, the Business Officer, would have caused Five Town College to completely lose its accreditation. The other fraud was the cover-up of the management fraud by Agent Richardson, who conspired with Stanley, to shift the blame to the plaintiff. By interfering in the MSA evaluation team visitation, Agent Richardson deflected Stanley's wrongdoings to attention onto Martin. Agent Richardson was unaware that he was acting in ignorance of the Act of '65.

88. Moreover, the MSA Evaluation Team reviewed and relied on the independent auditor's report that was submitted to MSA by Stanley. Yet, none of the required disclosures were made which would have alerted MSA to serious deficiencies in the accreditation standards. These omissions and misstatements in the audit reports certified by the Tepper CPA Firm enabled Stanley to evade detection and accountability under the laws of higher education for many years.

89. Without going into the MSA Evaluation Team Reports themselves, during the 2007 visitation, the MSA observation team found that Five Towns College did not meet several of the required standards to be accredited. In the follow-up visit in 2013, the MSA Evaluation Team Report found additional deficiencies. It must be pointed out that Agent Richardson played a role in both of these visitations. First, Agent Richardson, in an ongoing and continued attempt to

deflect Stanley's wrongdoings made it so that Martin could not speak to the MSA team privately. Agent Richardson obviously wanted to be privy to Martin's comments, so that Agent Richardson could discredit Martin and aid in the cover-up. Secondly, Agent Richardson went on a ill-spirited campaign to disparage Martin to MSA members and others, and attempted to blame most of the confusion on Martin since that was in-line with Stanley's FCA complaint. Then, Agent Richardson erased confidential emails that Martin sent to the MSA visitation team which contained evidentiary material to further cover-up Stanley's wrongdoing.

90. Nonetheless, the MSA visitation team did identify many of the various symptoms which led to the failure of the College to meet critical standards. However, the MSA team couldn't spend the time full investigating the actual reasons.

COUNTS

***With respect to the Tepper CPA Firm***

COUNT I

*Certified public accountants, as members of the AICPA, have a duty of independence under the AICPA Code of Professional Conduct.*

91. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs, as if fully set forth herein.

92. The Tepper CPA Firm had a duty to maintain their independence as auditors of Five Towns College, and the Five Towns College Real Property Trust. The Tepper CPA Firm conducted certified audit examinations of Five Towns College, and issued review statements of the Trust, but never disclosed related party transactions as required. In addition, the Tepper CPA Firm issued false and misleading financial statements.

93. Due to the violations of their duty of independence, the Plaintiff was provided with false and misleading information regarding various transactions involving the College and the Trust. Consequently, the plaintiff was fraudulently induced into various investments into the College and related entities. Therefore, the plaintiff, and is entitled to a finding of damages.

## COUNT II
*Certified public accountants who prepare certified financial reports must prepare and issue such reports based on generally auditing standards.*

94. Plaintiff re-alleges and incorporates, by reference all allegations in all preceding paragraphs, as if fully set forth herein.

95. A finding that Stanley Tepper and the Tepper CPA Firm failed to recognize internal control violations in providing accounting services to the Five Towns College Board of Trustees.

96. The deviation from generally accepted auditing standards is a violation of the auditor's duty of disclosure. As such, the plaintiff is entitled to restitution and damages for the amounts of income from not distributed by his investments n the College and related entities, and all costs associated with the plaintiff's being falsely induced to invest in the Trust and Partnership.

## COUNT III
*A certified public accountant that issues a review report must comply with the standards for review reports under AICPA rules.*

97. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs, as if fully set forth herein.

98. A finding that Stanley Tepper and the Temper CPA Firm issued  review reports to the Trustees of the Five Towns College Real Property Trust, but failed to carry out the due diligence procedures required in accordance with generally accepted auditing standards.

## COUNT IV

*A finding that the Tepper CPA Firm failed to properly record the costs of construction and real property development in accordance with the leasehold agreement between Five Towns College and the Real property Trust (page 4, par. 2. Trust Agreement)*

99. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs, as if fully set forth herein.

100. The Trust Agreement which governs the administration of the Trust was a  source document. The terms called for the recognition of the dormitory construction as a Trust asset. However, this was not accounted for properly.

101. There is clear evidence that the Tepper CPA Firm failed to properly account for the dormitory construction. Therefore, the Court out to direct the officers of the Trust and the College to adjust their book and records to properly account for the property additions.

## COUNT V

*A finding that the Tepper CPA Firm failed to properly recognize the income generated by the dormitories built by Five Towns College for the benefit of the Trust beneficiaries.*

102.  Plaintiff re-alleges and incorporates, by reference, all allegations in all preceding paragraphs, as if fully set forth herein.

103. As owner of the newly constructed dormitories, the Trust was entitled to the income derived from the collection of those funds from the College. Instead, the income was improperly collected by the College.

104. The failure to properly record the income, as required by the source documents, the plaintiff ought to be entitled to damages.

## COUNT VI

*A finding that the Tepper accountants failed to properly account for the $990,000 which came from the income of the Trust beneficiaries.*

105. Plaintiff re-alleges and incorporates all preceding paragraphs above, as if fully set forth herein.

106. The plaintiff, as a shareholder in Arista Management, Ltd., collected profits from this partnership. They were deposited in an investment account for his benefit. These funds were taken by his father, Stanley Cohen, causing great confusion, and litigation costs.

107. With the failure of the Tepper CPA Firm and Robert Sherman to properly account for the roughly $990,000 in money transferred to the College from the investment accounts of the Trust beneficiaries, this money was effectively lost. The plaintiff's share was roughly $330,000. The plaintiff should be awarded restitution.

### *With Respect To Robert Sherman*

## COUNT VII

*A Business Officer is a fiduciary, and owes  a duty of loyalty to those whose business he handles.*

108. Plaintiff re-alleges, and incorporates by reference, all preceding paragraphs above, as if f

fully set forth herein.

109. During his tenure, as Business Office at Five Towns College, Robert Sherman, provided false and misleading information to the Tepper CPA Firm. In so doing, he aided and abetted the violation of the Tepper CPA Firm's independence and duty of trust.

110. Due to the promulgation of false and misleading information provided by Robert Sherman to the Tepper CPA Firm which was used to prepare the financial statements of the College, Trust, and Partnership, the plaintiff asks the Court to assess an amount for damages incurred since the acts of Robert Sherman caused the plaintiff to be fraudulently induced into various legal arrangements involving the College, the Trust, and the Partnership.

***With Respect to IRS Special Agent, Russell Richardson, and the other named Federal Agents***

*A court cannot allow federal agents to violate and act in a manner contrary to an act of Congress, and thus the court is entitled to issue a temporary restraining order restraining the agents from such conduct .*

111. Plaintiff re-alleges, and incorporates by reference, all preceding paragraphs above, as if fully set forth herein.

112. IRS Special Agent Russell Richardson , and other federal agents have embarked on a pattern of behavior pursuant to a tax crime. However, the applicable law is the Higher Education Act of '65 which pre-empts the tax law. IRS Special Agent Russell Richardson must allow the application of the law of higher education be used to re-assess the losses, liabilities, and other unlawful acts committed at the College first. This must include the restatement of the financial statements for the College, the Trust, and the Partnership. Once, the financial statements are reconstructed, if a tax liability exists, then any civil or criminal tax liabilities may be assessed.

Meanwhile, the court is empowered to issue an order restraining federal agents from acting in a manner that is inconsistent with the intent of the US Congress. This includes restraining federal agents from interring with the instant case.

### With respect to the Tepper CPA Firm and Robert Sherman, as co-conspirators

*A conspiracy is an illegal agreement between two, or more persons, to pursue a common goal which has an unlawful objective.*

113. Plaintiff re-alleges and incorporates, by reference, all allegations in all preceding paragraphs.

114. Based on the fact that Robert Sherman and the Tepper CPA Firm collectively acted to provide false and misleading information in the financial reports of the College, the Trust, and the Partnership in a conspiratorial effort to defraud the plaintiff of his financial interests in these entities.

115. Due to the concerted efforts of the Tepper CPA Firm and Robert Sherman, the plaintiff is entitled to a finding that together these defendants engaged in a conspiracy to defraud the plaintiff.

PRAYER FOR RELIEF

### With respect to the Tepper CPA Firm

116. Based on a finding of fraud, the Tepper CPA Firm shall provide remuneration for the Plaintiff's loss of income from the Five Towns College Real Property Trust.

117. Based on a finding of fraud, the Tepper CPA Firm shall provide remuneration for the Plaintiff's loss of his equitable interest in the Five Towns College Real Property Trust in the sum of $19 million dollars, plus interest since 2005, or the maximum amount of coverage based on the Tepper CPA Firm professional liability policy; whichever is less.

118.  A declaratory judgment by the court that Robert Sherman breached his duties of loyalty and trust to the College, the Trust, and the Partnership and therefore must pay damages to the plaintiff.

119. A temporary restraining order prohibiting IRS Special Agent Russell Richardson, and IRS Special Agent David Perry, and other federal agents from continuing to employ surveillance and other techniques to undermine the plaintiff's lawsuits based on higher education law, including the instant case.

120. Moreover, IRS Special Agents Russell Richardson and other federal agents should be retained from interfering with the plaintiff's employment and need for a working income during the pendency of this matter.


                    Respectfully Submitted,


                    _Martin Cohen_                    April 2, 2024

                    Martin L. Cohen, pro se
                    1 Shore Avenue #464
                    Oyster Bay, NY 11771
                    Tel. (516) 364-7632
                    mart32753@aol.com